**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KELVIN P. KING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10 C 7458** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kelvin P. King seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to *28* U.S.C. § 636(c), and Plaintiff filed a motion for summary judgment. After careful review of the record, the Court now denies Plaintiff's motion and affirms the decision to deny him benefits.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on January 7, 2008, alleging that he became disabled on April 18, 2007 due to a herniated disc and respiratory problems. (R. 156-59, 162-64, 196). The SSA denied the applications initially on April 16, 2008, and again upon reconsideration on July 11, 2008. (R. 87-95, 106-13). Plaintiff filed a timely request for hearing and appeared before

Administrative Law Judge Curt Marceille (the "ALJ") on October 6, 2009. (R. 14). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from Plaintiff's friend, Umeka Herrod, Medical Expert James McKenna, M.D. (the "ME") and vocational expert Pamela Tucker (the "VE"). Shortly thereafter, on November 5, 2009, the ALJ found that Plaintiff is not disabled because he can perform a significant number of light jobs available in the national economy. (R. 15-25). The Appeals Council denied Plaintiff's request for review on August 25, 2010, (R. 3-5), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of his request for remand, Plaintiff argues that the ALJ: (1) made a flawed credibility assessment; (2) ignored important medical evidence in determining Plaintiff's residual functional capacity ("RFC"); and (3) relied on improper testimony from the VE. As discussed below, the Court finds no merit to these challenges, and affirms the ALJ's decision.

## FACTUAL BACKGROUND

Plaintiff was born on January 27, 1956, and was 53 years old at the time of the ALJ's decision. (R. 156, 162). He is a high school graduate with past relevant work as a forklift/truck driver for lumber companies. (R. 197, 200).

### A.    Medical History

#### 1.    Back Injury and Treatment (September 2006 through January 2007)

On September 8, 2006, Plaintiff injured his back at work while lifting an 80-pound bag of cement. (R. 307). Three days later, he reported to Alexian

Brothers Corporate Health Services ("Alexian Health") complaining of left leg and hip pain that was "progressively . . . getting worse." (*Id.*). X-rays of Plaintiff's lumbar spine and left hip showed mild scoliosis and minimal degenerative changes. (R. 350-51). The doctor diagnosed "left-sided low back/hip strain (sciatica)" and allowed Plaintiff to return to work with some lifting and bending restrictions. (R. 308, 355).

Throughout the following week, Plaintiff continued to receive treatment at Alexian Health, including prescriptions for Flexeril, Ibuprofen/Motrin and Naproxen. (R. 355, 358, 361, 363). On September 22, 2006, he had an MRI of the lumbar spine which showed a large "central/left paracentral disc protrusion at L5-S1" causing "significant compression of the thecal sac." (R. 368). Based on this result, Alexian Health referred Plaintiff to Babak Lami, M.D., of the Illinois Spine Institute, S.C., for a consultation. (R. 372-73).

Dr. Lami examined Plaintiff on September 29, 2006 and diagnosed him with "[l]eft leg radiculopathy with herniated nucleus pulposus." He recommended a lumbar epidural injection and physical therapy at that time, but also indicated that "microdiscectomy might be an option" if this conservative treatment failed. (R. 263-65, 279, 374). Two days later, on October 1, 2006, Plaintiff went to the Alexian Brothers Medical Center emergency room complaining of low back pain. (R. 376). He received a prescription for Vicodin and was discharged in stable condition with a reported pain level of 5 out of 10. (R. 377).

The next day, Plaintiff called Dr. Lami and said that the epidural injection had not helped, he was unable to walk, and he wanted to have surgery. (R.

3

260).  Dr. Lami performed the microdiscectomy on October 4, 2006, (R. 271-72), and by October 12, 2006, Plaintiff was "doing extremely well" with no more radiculopathy or focal or neurological deficit.  Plaintiff said that he was "extremely happy" with the surgical results, and Dr. Lami scheduled him for three weeks of physical therapy.  (R. 259, 278).  When Plaintiff saw Dr. Lami again on November 9, 2006, he was "doing great" with "very minimal symptoms."  (R. 258).  Dr. Lami instructed him to remain off work for two more weeks, after which he could return to light duty with "no lifting more than 10 pounds [or] repetitive bending."  (R. 258, 275).

Plaintiff started light work on December 11, 2006, (R. 274), and on January 11, 2007, Dr. Lami discharged him from his care.  (R. 257).  Plaintiff showed "no deficit" at that time, and Dr. Lami stated that he could return to work without restrictions on January 17, 2007.  (R. 257, 273).  Dr. Lami noted that Plaintiff would come to see him "on an as needed basis" and "underst[ood] that if [he] has any questions or problems, he certainly can contact me anytime."  (R. 257).  Plaintiff never contacted Dr. Lami or sought additional medical treatment for his back after January 2007.

### 2. Disability Application and Related Exams (January through June 2008)

On January 7, 2008, approximately one year after he was released to full duty work, Plaintiff applied for disability benefits.[1]  The following month, on

---

[1] As discussed later in more detail, in the interim, Plaintiff was fired from his job in April 2007 and collected unemployment insurance through November 2007.

February 23, 2008, ChukwuEmeka F. Ezike, M.D., conducted an Internal Medicine Consultative Examination of Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R. 282-85). Plaintiff told Dr. Ezike that he has "nerve damage in his left leg," as well as back pain that is "intermittent, dull, occasionally sharp, about 7/10 in severity, worse in the morning, and associated with stiffness upon waking up." (R. 282). Plaintiff also complained of shortness of breath (dyspnea) on exertion, including walking and climbing stairs, though he "ha[d] not been diagnosed for his symptoms." (*Id.*). Plaintiff said that he can walk one block, stand for 10 minutes, sit for 30 minutes, and lift up to 15 pounds at a time. He was able to drive to his appointment, but he needs help cleaning his home and does not shop. (R. 283).

Dr. Ezike observed that Plaintiff was able to get on and off the exam table with no difficulty, and could walk more than 50 feet without support. His gait was "slightly antalgic" with the use of a cane, but he was able to walk without any assistive device. (R. 284). Dr. Ezike found Plaintiff to have normal grip strength in both hands, and normal range of motion in the shoulders, elbows, wrists, hips, knees, ankles and cervical spine. He exhibited lumbar flexion to 60 degrees (normal) and extension to 20 degrees (25 is normal), both with mild pain, and a straight leg raise test was negative. [2] (*Id.*). Plaintiff did have decreased

---

[2] Plaintiff cites to page 3454 of the *Merck Manual of Diagnosis and Therapy* for the proposition that normal lumbar flexion is 125 degrees, and normal lumbar extension is 115 degrees. (Doc. 29, at 5). Those figures, however, are for range of motion in the hip. The cited page does not address range of motion in the lumbar spine.

sensation in his left leg, but his deep tendon reflexes were equal and symmetric. (*Id.*).

Dr. Ezike diagnosed Plaintiff with "[c]hronic low back pain, status post surgery," "[l]umbar radiculopathy," and "[p]ossible COPD" (chronic obstructive pulmonary disease). (R. 285). Though Plaintiff's lungs were clear "without rales, rhonchi or wheezes," he did exhibit prolonged expiration and Dr. Ezike recommended that he undergo pulmonary function testing. (*Id.*). Plaintiff's March 28, 2008 pulmonary test showed that he had a very severe obstruction before taking medication, but he experienced significant improvement with medication. His best FEV1 value was 1.75. (R. 298).

On April 11, 2008, Richard Bilinsky, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff for DDS. (R. 287-94). Dr. Bilinsky found that Plaintiff can occasionally lift 20 pounds, frequently lift 10 pounds, stand, walk and/or sit for 6 hours in an 8-hour workday, and push/pull without limitation. (R. 288). Plaintiff must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation due to his possible COPD, and he can only occasionally climb ladders, ropes or scaffolds. (R. 289, 291). Dr. Bilinsky identified no other limitations, however, citing Dr. Ezike's objective findings regarding Plaintiff's ability to walk, range of motion, and mild pain with flexion and extension. (R. 289-91, 294). Francis Vincent, M.D., affirmed Dr. Bilinsky's assessment on June 28, 2008. (R. 302-04).

**B.     Plaintiff's Testimony**

In a June 17, 2008 Function Report completed in connection with his application for disability benefits, Plaintiff stated that he is able to do laundry, drive, go to the store, and lift about 20 pounds.  (R. 216-19).  He can only walk 50 to 80 feet before needing to stop and rest for 15 to 20 minutes, however, and his back pain and breathing problems make it difficult for him to lift, squat, bend, walk, kneel and climb stairs.  (R. 219).  In that regard, he uses a cane, though no doctor prescribed it.  (R. 220).  Plaintiff stated that his "severe sciatica" renders him unable to work, and claimed that he was "going to continue further medical testing."  (R. 214, 221).  In an undated Disability Report – Appeal, Plaintiff reported that his condition worsened as of April 20, 2008, and that he experiences "[s]evere pain in lower back from surgery."  (R. 207).

At the October 6, 2009 hearing before the ALJ, Plaintiff testified that he was fired on April 18, 2007 after he "ran into something at a job site."  (R. 34). He collected unemployment from May to November 2007, certifying that he was ready, willing and able to work, and then obtained food stamps and a "link card" through the state.  (R. 35, 37).  He looked for work until December 2007, when he noticed that he was having "medical problems" and was unable to sit, stand or walk more than 25 or 30 feet without stopping to rest.  (R. 36-37, 41).

Plaintiff stated that he suffers from "sciatica" with pain radiating down his left leg.  He described the pain as an "excruciating" 7 out of 10 that goes "from bad to worse," but he was not taking any medications at the time of the hearing, and he used only over-the-counter medications "in the past."  (R. 38-39).  The

last time Plaintiff sought treatment for this pain was in July 2008, when he went to the Cook County Hospital because a family court judge ordered him to obtain medical documentation to support his claim that he was unable to look for work. (R. 39).  These treatment notes do not appear in the record.

In addition to the back pain, Plaintiff also complained of breathing problems lasting a period of 18 months to two years.  (R. 41).  He said that if he walks more than 3 or 4 steps, he has to "stop and rest to catch my breath," but he denied taking any medication.  Indeed, the only treatment he ever sought or obtained for this condition was from Dr. Ezike in connection with his application for disability benefits.  (R. 41-42).  Plaintiff's explanation for this lack of treatment was that "it's hard to explain . . . what I have."  (*Id.*).  He also admitted that he smokes 10 to 15 cigarettes a day.  (R. 42).

Though Plaintiff is not under a doctor's care for his back or breathing problems, he testified that these impairments still limit his ability to walk more than 25 or 30 feet at a time.  In addition, he can only stand and sit for 10 to 15 minutes before experiencing "extreme[] pain[]," he cannot lift a gallon of milk, and he has trouble bending his fingers, bending at the waist and reaching overhead. (R. 41, 43, 53).  Plaintiff testified that he renewed his driver's license in January 2009 "for an absolute emergency," but he is not able to drive due to back pain. (R. 44, 54).  He spends his days walking up and down the hall in the hotel where he lives, doing "a little stretching," and reading, and he occasionally walks a block to the nearest Walgreens.  (R. 45, 47-48, 52).  He can do his laundry if someone

helps him, but there is no kitchen or refrigerator in the hotel where he lives and he has a maid service to do the cleaning.  (R. 46, 50, 52).

In response to questions about his financial situation, Plaintiff said that he is not taking any medications because he does not have access to medical or financial assistance.  (R. 55).  He had medical insurance through May 2007, but he never sought treatment after Dr. Lami discharged him in January 2007 because "[t]he problem wasn't consistent" but would "come and go."  (R. 41, 82).  In addition, Plaintiff claimed that he "had no way of getting to see [Dr. Lami] . . . in Rolling Meadows" even though he had a car.  (R. 83).  Plaintiff applied for a medical card after his insurance expired, but the request was denied.  (R. 39-40).  As a result, he just "put[s] up with the pain."  (R. 55).

## C.    Testimony of Umeka Herrod

Plaintiff's friend Umeka Herrod testified on his behalf at the hearing.  She said that she met him in June or July 2007, and that she has been paying his rent for a "little bit over a year now," most recently in the amount of more than $900 per month.  (R. 58-60).  She also pays for his cigarettes ($5.19 per pack per day) and helps him with "basic necessities."  (R. 61).  Ms. Herrod stated that Plaintiff has trouble walking up stairs, and complains "[a]ll the time" of "real sharp pains in the back."  (R. 64).  When the ALJ asked her whether she thought she should take Plaintiff somewhere for treatment, she responded, "Yes, but I can only do so much.  If he don't want me to take him or, you know, sometimes I can't do it, I have four other children.  So sometimes it's hard to try to balance everybody at the same time."  (R. 66).

**D.    Medical Expert's Testimony**

Dr. McKenna testified at the hearing as an ME.  He stated that based on his review of the medical records, the microdiscectomy was "a surgical success" that produced "an optimal outcome" for Plaintiff.  (R. 69, 71).  By January 11, 2007, Plaintiff was doing "extremely well" and received no further treatment or medical testing until he saw Dr. Ezike in February 2008.  (R. 69-70).  At that time, he reported significant limitations that reduced him to what the ME described as "an extremely sedentary lifestyle."  (R. 70).  According to the ME, however, there is "nothing really to support" Plaintiff's subjective complaints of pain.  (R. 78). Though Dr. Ezike documented reduced lumbar flexion and extension, a straight leg raise test was negative, and Plaintiff had normal range of motion in all of his joints.  (R. 70-71).  In addition, Plaintiff is not taking any analgesic for pain and has no "ongoing treatment relationship" for his back condition.  (*Id.*).

With respect to Plaintiff's respiratory problems, the ME testified that he presumably has "chronic bronchitis from smoking," but there is no evidence that he has COPD or asthma.  (R. 74-75).  In discussing Plaintiff's FEV1 value of 1.75, the ME questioned whether this test result was really reliable. Nevertheless, he opined that it does not meet or equal a listing, and that even viewing the evidence conservatively, Plaintiff is capable of performing light work as long as he avoids:  concentrated exposure to respiratory irritants, extreme cold, heat, and humidity; and climbing ropes, ladders and scaffolds.  (R. 75).

### E.    Vocational Expert's Testimony

Pamela Tucker testified at the hearing as a VE.  The ALJ asked her to consider a hypothetical person of Plaintiff's age, education and past work experience who can: occasionally lift 20 pounds; frequently lift 10 pounds; stand and walk for up to 6 hours in an 8-hour workday; sit for 2 hours in an 8-hour workday; and occasionally climb ramps and stairs; but cannot climb ladders, ropes or scaffolds; and must avoid concentrated exposure to fumes, odors, dust, gas, pulmonary irritants, chemicals, poor ventilation, extreme heat and cold, and excessive wetness or humidity.  (R. 84).  The VE testified that such a person would not be able to perform Plaintiff's past work, which she characterized as semiskilled and heavy as performed, but could do other light, unskilled work as an assembler (approximately 3,800 jobs available), inspector or tester (approximately 1,100 jobs available), or light packer (approximately 12,000 jobs available).  (R. 84-85).

### F.    Administrative Law Judge's Decision

The ALJ found that Plaintiff's "status post microdiscectomy and smoker's bronchitis" are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 18-19).  After discussing the medical and testimonial evidence in detail, the ALJ adopted the ME's opinion that Plaintiff has the capacity to perform light work with the following restrictions: he can lift a maximum of 20 pounds; he can stand/walk for 6 hours and sit for 2 hours in an 8-hour workday; he cannot climb ladders, ropes or scaffolds; he can only occasionally climb stairs and ramps; and he must "avoid

concentrated exposure to extreme cold, heat, humidity and pulmonary irritants, such as dust, fumes, odors, gases, poorly ventilated areas and chemicals." (R. 19, 22-23). The ALJ also accepted the VE's assessment that Plaintiff is not capable of doing any of his past work, but that there are a significant number of jobs in the national economy that he can still perform. (R. 23).

In reaching this conclusion, the ALJ noted that Plaintiff was doing "extremely well" when Dr. Lami released him from his care in January 2007, and that "with the exception of the consultative examination [in February 2008], the medical record is completely void of any treatment notes as it relates to his back impairment after January 2007." (R. 20). The February 2008 consultative examination, moreover, was "generally normal," showing that Plaintiff: had no difficulty getting on and off the exam table; could walk more than 50 feet without support, though his gait was "slightly" antalgic; had no difficulty with heel/toe walking; had normal grip strength in both hands; had normal range of motion in his cervical spine; and had a negative straight leg raise test. (R. 18). Plaintiff did complain of shortness of breath, but his lungs were clear without rales, rhonchi or wheezing, and he has never taken any related medication aside from the nebulizer treatment he received from Dr. Ezike. (R. 21).

With respect to Plaintiff's testimony, the ALJ concluded that his statements regarding pain and limitations were inconsistent and "not fully credible." (R. 22). For example, Plaintiff testified at the October 2009 hearing that he can only walk 25 to 30 feet and cannot lift more than 3 pounds. (R. 20, 43). In his June 17, 2008 Function Report, however, Plaintiff indicated that he can walk 50 to 80 feet

and lift about 20 pounds. (R. 20, 219). In addition, Plaintiff claimed that he needs to use a cane or hang onto furniture to move around, but Dr. Ezike reported that Plaintiff can walk more than 50 feet without any support. (R. 20, 21, 50, 56).

The ALJ found that other evidence similarly "implies [Plaintiff] exaggerated his symptoms at the hearing." (R. 21). Plaintiff complained of arthritis in his hands and an inability to reach overhead, but the objective medical evidence revealed normal grip strength in both hands and no evidence whatsoever of problems with reaching or using his arms. (R. 20-21). As for Plaintiff's assertion that he does not cook, do dishes or clean, the ALJ found that this is "likely" because Plaintiff's hotel room has no kitchen and he relies on a maid service for cleaning. In the ALJ's view, "[t]his suggests the limitations in his activities of daily living are not due to his conditions, but rather due to a lack of access to complete such activities." (R. 20).

Also troubling to the ALJ was Plaintiff's failure to seek treatment or prescription medications after January 2007 despite his allegedly disabling pain. Plaintiff offered several explanations, including that he has no health insurance, cannot afford medical care, and did not know who to see for his pain. (*Id.*). In finding these explanations not entirely credible, the ALJ noted that (1) Dr. Lami made it clear that Plaintiff could contact him if he had any problems, (2) if Plaintiff were really in excruciating pain, "I would expect to see follow-up medical treatment or, at least, evidence of prescribed medication to reduce the alleged pain with or without insurance. Instead, [Plaintiff] takes only over-the-counter

13

medications for pain," (3) Plaintiff looked for work through December 2007 and held himself out as ready, willing and able to work during that time in order to collect unemployment insurance, (4) Plaintiff did not use his unemployment insurance to seek medical help and instead bought "other things, such as cigarettes," and (5) Plaintiff's friend paid a lot of money for his rent and cigarettes, and "[g]iven the extreme problems alleged by [Plaintiff], it seems incredible that a friend as generous as Ms. Herrod would rather purchase cigarettes for [Plaintiff] than assisting him in obtaining some type of treatment, at the very least prescription medication, for his pain." (R. 21-22).

Based on these findings, the ALJ determined that Plaintiff is not disabled within the meaning of the Social Security Act, and is therefore not entitled to benefits.

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence,

which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act.[3] *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008). A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). In

_____

[3]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

Plaintiff argues that the ALJ's decision should be reversed because he: (1) made a flawed credibility assessment; (2) ignored important medical evidence in determining Plaintiff's RFC; and (3) relied on improper VE testimony at Step Five of the analysis.  The Court addresses each argument in turn.

### 1.    Credibility Determination

Plaintiff first objects that the ALJ did not provide valid reasons for finding his testimony less than fully credible.  In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence.  *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007).  If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record."  *Id*.  *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir.

2004).  Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

As a preliminary matter, the Court notes that the ALJ included the following language in his credibility analysis:  "I find the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [stated] residual functional capacity assessment." (R. 22).  The Seventh Circuit has repeatedly criticized this template as "unhelpful" and "meaningless boilerplate," but ALJs continue to use it in their decisions. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).  Each time they do so, plaintiffs and their counsel seize on the language as evidence that the credibility finding is backwards and defective.  *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (the template "implies that ability to work is determined first and is then used to determine the claimant's credibility.  That gets things backwards.").

The Court agrees that the "hackneyed language seen universally in ALJ decisions adds nothing" to a credibility analysis.  *Shauger*, 675 F.3d at 696. Where, as here, however, the ALJ provides a detailed discussion of the plaintiff's symptoms and testimony, and the reasons he did not find the plaintiff's statements fully credible, the use of the boilerplate template does not alone provide a basis for remand.  Plaintiff's argument to that effect is rejected.

Turning to the ALJ's substantive analysis, he first noted that Plaintiff's reports of pain were not supported by any medical evidence. Dr. Lami discharged Plaintiff to work without restrictions in January 2007, stating that he was "doing great" with "very minimal symptoms," and showed "no deficit." (R. 257-58). Plaintiff did not seek or receive any further treatment until he had a consultative examination arranged by DDS in February 2008. At that time, Dr. Ezike reported that Plaintiff had some decreased sensation in the left leg, but otherwise he: was able to get on and off the exam table with no difficulty; could walk more than 50 feet without support; had normal grip strength in both hands; had normal range of motion in the shoulders, elbows, wrists, hips, knees, ankles and cervical spine; had a "slightly" antalgic gait; exhibited lumbar flexion to 60 degrees and extension to 20 degrees with only mild pain; had a negative straight leg raise test; had equal and symmetric deep tendon reflexes; and had clear lungs without rales, rhonchi or wheezing. (R. 284).

The ALJ also discussed Plaintiff's testimony, including his claims that he can barely move and lives in constant, excruciating pain. In finding this testimony unpersuasive, the ALJ noted that Plaintiff provided inconsistent statements regarding his physical abilities. (R. 20). In the June 17, 2008 Function Report, Plaintiff indicated that he has no problem with his personal care, he can walk 50 to 80 feet, lift about 20 pounds, go outside "daily if [the] weather is good," prepare his own meals on a weekly basis consisting of "basic sandwich[es]" and "frozen microwave" food, and do laundry, though it takes him 1 1/2 hours. (R. 215-17, 219). At the hearing, however, Plaintiff testified that he

cannot walk more than 25 or 30 feet, he needs a cane, he can only do laundry with help, he cannot lift more than 3 pounds, and he does not cook, do dishes or clean at all. (R. 41, 43, 45-46).

Plaintiff responds that the change in his testimony reflects the fact that he suffered a "steady progression of limitation" after his surgery. (Doc. 29, at 7). He notes that he filled out the June 2008 Function Report more than a year before the hearing took place in October 2009, and speculates that "[c]ommonsense would indicate that an individual suffering from pain status-post microdiskectomy may have deterioration over time in functional ability due to his medical condition." (*Id.* at 7, 9).

The problem for Plaintiff is that his claim of deterioration finds no support whatsoever in the record. Plaintiff alleges that he became disabled in April 2007, but in February 2008, Dr. Ezike identified relatively mild physical and respiratory limitations. By the time of the October 2009 hearing, moreover, Plaintiff was not taking even over-the-counter medications despite claiming to suffer from "excruciating" pain and significant breathing problems. (R. 38). The ME testified that given Plaintiff's optimal surgical outcome, he saw no objective evidence to explain Plaintiff's complaints of pain, and agreed that he is capable of performing light work. (R. 75, 79). As the ALJ noted, this assessment is consistent with the available medical evidence and "there is no contrary opinion in the record." (R. 22-23). Viewing the case as a whole, Plaintiff's self-serving theory that his condition "may have" worsened is "so contradicted by the medical record that it is wholly unbelievable." *Eskew v. Astrue*, 462 Fed. Appx. 613, 616 (7th Cir. 2011).

Plaintiff argues that the ALJ still committed reversible error by discounting his testimony that he does not cook or clean. (Doc. 29, at 7). The ALJ observed that Plaintiff "likely" does not perform these activities because he lives in a hotel with no kitchen and maid service, which "suggests that the limitations in [these] activities of daily living are not due to his conditions, but rather due to a lack of access to complete such activities." (R. 20, 46, 50). Plaintiff stresses that he told Dr. Ezike in February 2008 that he needs assistance cleaning "*his home*," and that the record does not indicate whether he was living in the hotel at that time. (R. 283; Doc. 29, at 7 (emphasis in original)). As a result, Plaintiff argues, "the ALJ's attempt to create an inconsistency at this juncture fails." (Doc. 29, at 7). Since Plaintiff does not claim that he was in fact living in a home or apartment as opposed to a hotel, this argument does nothing to advance his position.

In an attempt to get around the complete lack of medical evidence, Plaintiff focuses on his testimony that he cannot afford treatment. Under SSR 96-7p, "[w]here the record contains evidence that a claimant could not afford treatment, the ALJ must explore the claimant's ability to pay before relying on the lack of treatment to support an adverse credibility finding." *Alesia v. Astrue*, 789 F. Supp. 2d 921, 934 (N.D. Ill. 2011) (citing *Craft*, 539 F.3d at 678-79). Plaintiff claims that since he is unable to pay for medical care, the ALJ was not permitted to discount his testimony based on the absence of treatment records. (Doc. 29, at 7-9).

As required by *Craft*, the ALJ did address Plaintiff's ability to pay for care both at the hearing and in his decision. In finding that testimony unpersuasive,

the ALJ observed that Plaintiff: (1) still had health insurance through May 2007, after his alleged disability onset date, but he never sought any treatment or medication after Dr. Lami discharged him in January of that year; (2) collected unemployment insurance from May to November 2007 and held himself out as being ready, willing and able to work during that time; (3) reported that he actively tried to find work through December 2007; and (4) had a "generous" friend who helped pay his rent (more than $900 per month) and buy him cigarettes (approximately $150 per month), making it "seem[] incredible that [she] would rather purchase cigarettes for [Plaintiff] than assisting him in obtaining some type of treatment, at the very least prescription medication, for his pain." (R. 21-22).

The Court agrees that certain of the factors relied on by the ALJ are insufficient to undermine Plaintiff's credibility. With respect to the unemployment insurance, for example, the Seventh Circuit has noted that "[a] desperate person might . . . certify that []he is able to work [and] that does not necessarily mean []he is not disabled." *Richards v. Astrue*, 370 Fed. Appx. 727, 732 (7th Cir. 2010). Here, it is clear that Plaintiff has financial difficulties, as evidenced by his reliance upon food stamps and friends to purchase food and pay rent. (R. 35). Thus, his collection of unemployment insurance is not necessarily indicative of his ability to work. In addition, the fact that Plaintiff did not pursue treatment for approximately a month and a half before his health insurance expired back in May 2007 does not necessarily undermine his claim that he was subsequently unable to obtain medical care or prescriptions for financial reasons.

21

Nevertheless, to the extent that the ALJ made any error in discussing Plaintiff's lack of treatment, the error was harmless in this case. *See McKinzey*, 641 F.3d at 892 ("[A]dministrative error may be harmless; we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result."). "[A]n ALJ's credibility assessment will stand 'as long as [there is] some support in the record.'" *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)). Here, the uncontroverted consultative and functional capacity evaluations performed by Dr. Ezike and Dr. Bilinsky indicate that Plaintiff is capable of light work, and the ME agreed with these assessments. Plaintiff's testimony that he is totally disabled is directly contrary to these medical sources, and he cites to no competing evaluation.

In addition, the fact that Plaintiff was not taking even non-prescription medications to try and combat his "excruciating" pain "could justify a more skeptical view of his testimony." *Berger*, 516 F.3d at 546. On this record, the ALJ was not patently wrong in finding that Plaintiff was exaggerating his symptoms at the hearing. *See Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006) ("Applicants for disability benefits have an incentive to exaggerate their symptoms, and an [ALJ] is free to discount the applicant's testimony on the basis of other evidence in the case."); *Powers v. Apfel*, 207 F.3d 431, 435-36 (7th Cir. 2000) ("The discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating her condition.").

Plaintiff's remaining objections to the ALJ's credibility finding are easily overruled. The ALJ noted that although Plaintiff complained of arthritis in his hands, Dr. Ezike found that he had normal grip strength. (R. 20-21). Plaintiff stresses that Dr. Ezike's report does not mention arthritis, (Doc. 29, at 9), but the record reveals that Plaintiff complained about this condition at the hearing. (R. 43-44). The ALJ also stated that the Social Security Administration Field Officer who interviewed Plaintiff regarding his application for benefits "did not observe [Plaintiff] having any difficulty with sitting, standing, walking or using his hands." (R. 21, 193). Plaintiff insists that this was improper, but SSR 96-7p instructs that in assessing the consistency of a claimant's statements, an ALJ should consider "observations recorded by SSA employees in interviews." *Id.* at *6. Plaintiff cites to no contrary authority.

It is well-established that a court should not "nitpick the ALJ's opinion for inconsistencies or contradictions," but should instead "give it a commonsensical reading." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). In this case, Plaintiff's complaints of excruciating pain and disabling breathing problems are wholly contradicted by the medical findings and other record evidence, and the ALJ was not patently wrong in discounting that testimony.

### 2. RFC Determination

Plaintiff next argues that the case must be remanded because the ALJ failed to consider all of his medical conditions in making an RFC assessment. A claimant's RFC is the maximum work that he can perform despite any limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. The RFC determination is a legal

decision rather than a medical one.  20 C.F.R. § 404.1527(d)(2).  "When determining the RFC, the ALJ must consider all medically determinable impairments, . . . even those that are not considered 'severe.'"  *Craft*, 539 F.3d at 676.

Plaintiff begins by objecting generally that the ALJ "performed no functional analysis either at Step Two or Four; nor did he provide a narrative discussion as required by the Ruling."  (Doc. 19, at 12).  In fact, the ALJ discussed all of Plaintiff's impairments, the objective medical evidence, his daily activities, his course of treatment, his statements regarding his limitations, his use of medications, and the testimony of his friend.  (R. 18-23).  Plaintiff reiterates his complaint that the ALJ failed to accept all of the limitations he described at the hearing, claiming that these also should have been incorporated into the RFC.  (Doc. 19, at 12).  As explained earlier, however, the ALJ reasonably discounted Plaintiff's complaints of debilitating pain and breathing problems because they were contradicted by other record evidence.  The ALJ's RFC analysis more than satisfies the requirements of SSR 96-8p and will not be reversed here.

Plaintiff seeks to avoid this result by contending that the ALJ "'cherry picked' elements from the medical record without evaluating evidence contrary to his position."  (Doc. 29, at 12).  Plaintiff directs the Court to his pre-surgical lumbar spine MRI dated September 2006, which showed "disc desiccation" at L2-L3, L3-L4, and L4-L5.  (R. 262).  In Plaintiff's view, the microdiscectomy "did nothing about" the desiccation (*i.e.*, dryness), and this condition "may have been

medically and symptomatically significant." (Doc. 29, at 12). Once again, Plaintiff's speculation finds no support in the record. He does not identify any physician who discussed the significance of the desiccation, much less opined that it has impacted his physical abilities in any way. Rather, the record evidence shows that Dr. Bilinsky, Dr. Ezike and the ME all believe Plaintiff is capable of performing light work with only some restrictions on climbing and exposure to respiratory irritants. Plaintiff "does not draw [the Court's] attention to any evidence that conflicts with [this] conclusion." *Knox v. Astrue*, 327 Fed. Appx. 652, 657 (7th Cir. 2009).

Also unavailing is Plaintiff's argument that the ALJ ignored his respiratory problems. The ALJ expressly considered Plaintiff's "smoker's bronchitis" and determined that he needs to "avoid concentrated exposure to extreme cold, heat, humidity and pulmonary irritants, such as dust, fumes, odors, gases, poorly ventilated areas and chemicals." (R. 19). This is entirely consistent with Dr. Bilinsky's April 2008 RFC assessment and the ME's testimony. Plaintiff disagrees, but cites to no contrary medical source or other record evidence suggesting that he has any greater limitations. *See Compean v. Astrue*, No. 09 C 5835, 2011 WL 1158191, at *8 (N.D. Ill. Mar. 28, 2011) (citing *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)) (the ALJ "was entitled to rely upon the opinion of the state agency physician, particularly where no physician imposed any greater functional limitations than those found by the ALJ in her RFC determination."). Plaintiff's request for a remand based on the ALJ's RFC determination is denied.

### 3. Hypothetical Question

Plaintiff finally claims that the ALJ's decision must be reversed because he improperly relied on the VE's testimony in finding Plaintiff capable of performing a significant number of light jobs. Plaintiff first objects that "[t]here is no evidence that the VE reviewed any of the medical or other evidence in the case record." (Doc. 29, at 13). This argument is a non-starter given that the ALJ included all of Plaintiff's medically determinable impairments and limitations in the hypothetical question. *Compare Ragsdale v. Shalala*, 53 F.3d 816, 820 (7th Cir. 1995) (where hypothetical question omits certain impairments, the error "may be cured by a showing that prior to testifying the [VE] reviewed the claimant's record containing the omitted information.").

Plaintiff disagrees, but does not identify any additional limitations that the ALJ omitted and that are supported by the record evidence. *See Simila*, 573 F.3d at 521 (an ALJ's hypothetical question to a VE need only include limitations supported by medical evidence in the record). Plaintiff's request for a remand based on the VE's testimony is therefore denied.

### <u>CONCLUSION</u>

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 28) is denied. The Clerk is ordered to enter judgment in favor of Defendant.

ENTER:

Dated: September 19, 2012

_____
SHEILA FINNEGAN
United States Magistrate Judge